IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

| | | |
|---|---|---|
| MARK L. MCLAURIN and § | | |
| TWANA MCLAURIN § | | PLAINTIFFS |
| § | | |
| v. § | | CAUSE NO. 1:05CV463 LG-RHW |
| § | | |
| NOBLE DRILLING (U.S.) INC., ET AL. § | | DEFENDANTS |

**MEMORANDUM OPINION AND ORDER GRANTING
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

BEFORE THE COURT is the Defendants' Motion [146] for Summary Judgment. The Plaintiffs have responded and Defendants have replied. The Defendants, Noble Drilling (U.S.) Inc., Noble Drilling Corporation and Noble Drilling Services, Inc. (collectively, "Noble"), seek dismissal of Plaintiffs' remaining state law negligence claims. After due consideration of the submissions and the relevant law, it is the Court's opinion that there is no question of material fact for the jury. The Defendants' Motion is granted.

FACTS AND PROCEDURAL HISTORY

Plaintiff Mark L. McLaurin was employed as a scaffold carpenter by Friede Goldman Offshore, Inc., a shipbuilding company with a facility in Jackson County, Mississippi. Noble contracted with Friede Goldman for the conversion and refitting of the "Noble Clyde Boudreaux," one of Noble's offshore drilling rigs. The parties separately contracted for Friede Goldman to "furnish labor, material and equipment required, on a Lump Sum Basis, to fabricate, paint and install lower hull pontoon extensions." Ct. R. 147-6 p. 1. The pontoon extension project was just one of many projects involved in the extensive undertaking to refit and update the offshore drilling rig. Between 600 and 800 Friede Goldman employees and hundreds of other workers were utilized during the "Noble Clyde Boudreaux" project over an eight year period.

On July 30 and 31, 2002, McLaurin was assigned by Friede Goldman to construct scaffolding inside one of the pontoon extensions. A crane, operated by Friede Goldman employees, was in the process of lowering the roof structure of the pontoon for fitting and final placement. McLaurin was injured when he placed his hand in a "pinch point" - a space between two objects - while the roof was being lowered. McLaurin suffered a severely crushed left hand and arm.

McLaurin received medical benefits and disability compensation from Friede Goldman under the Longshore and Harbor Workers' Compensation Act ("LHWCA"). The Plaintiffs then sued Noble Drilling, alleging a negligence claim under Mississippi law, as well as § 905(b) of the LHWCA. Noble Drilling moved for summary judgment, arguing that prerequisites for a maritime tort did not exist under § 905(b) and that § 905(b) also preempted the plaintiffs' state-law tort claim. This Court granted a summary judgment. On appeal, the Fifth Circuit reversed the dismissal of plaintiff's state-law negligence claim against Noble Drilling. The Fifth Circuit held that "the plain language of § 933 clearly contemplates and preserves a maritime worker's ability to pursue separate claims against third parties, including vessel owners allegedly responsible for the injury." *McLaurin v. Noble Drilling (U.S.) Inc.*, 529 F.3d 285, 293 (5th Cir. 2008). Thus, what remains of this case is Plaintiffs' state-law claim of negligence against Noble.

## DISCUSSION

In Mississippi, the elements of a negligence claim are: 1) duty; 2) breach of the duty; 3) causation; and 4) injury. *Gulledge v. Shaw*, 880 So. 2d 288, 292-93 (Miss. 2004). Noble argues that the Plaintiffs will be unable to show that it owed any duty to McLaurin under Mississippi law, because Friede Goldman was an independent contractor that maintained control of all

aspects of the work its employees were performing on the "Noble Clyde Boudreaux."

In *Linn v. United States*, 281 Fed. Appx. 339 (5th Cir. 2008), the Fifth Circuit examined the nature of the duty owed to the employee of an independent contractor under Mississippi law.

> Generally, under Mississippi law, the owner of a premises "has a duty to use reasonable care to keep its premises in a reasonably safe condition for business invitees." *Coho Res.*, 829 So.2d [1] at 10 [(Miss. 2002)](quoting *Jones*, 701 So.2d at 782). But this duty does not automatically extend to the employees of independent contractors. *See id.* at 10-11 (citation omitted). The Mississippi Supreme Court has held that:
>
>> Where a party ... contracts with another ... to perform original construction or repair work ... and devolves upon the contractor the right and fact of control of the premises and the nature and details of the work, the owner has no liability for injuries experienced by the contractor's workers where those injuries arose out of or were intimately connected with the work.
>
> *Magee v. Transcon. Gas Pipe Line Corp.*, 551 So.2d 182, 185 (Miss. 1989); *see also Jackson Ready-Mix Concrete v. Sexton*, 235 So.2d 267, 271 (Miss. 1970) ("[T]he owner or occupier is under no duty to protect [a contractor's employees] against risks arising from or intimately connected with defects of the premises, or of machinery or appliances located thereon, which the contractor has undertaken to repair."). What is critical to determining whether the premises owner has a duty to the employees of an independent contractor is whether the owner maintains de jure control (under the contract) or de facto control (the contract notwithstanding) over the performance of that aspect of the work that has given rise to the injury. *Magee*, 551 So.2d at 186 (citations omitted).

*Linn*, 281 Fed. Appx. at 346-47.

The Fifth Circuit concluded that the *Linn* contract terms did not establish that the owner retained substantial control over performance of the work, deciding the case on the basis of de jure control. *Id.* at 348. The Plaintiffs in this case do not contend that Noble had de jure control; instead, they argue that Noble had de facto control over the performance of that aspect of the work that gave rise to McLaurin's injury.

In *Magee*, the Mississippi Supreme Court held that the owner did not retain sufficient de jure control over a project because: (1) a provision of the contract required the contractor to assume full responsibility for conditions pertaining to the work, the site and all conditions therewith; and (2) another provision of the contract required the contractor to assume responsibility for the care and maintenance of the work under construction until the work was accepted as completed by the owner. 551 So.2d at 186. In addition, the plaintiff did not offer evidence disputing the owner's claim that it did not retain de facto control of the work. *Id*. Thus, notwithstanding the fact that the owner had an employee on site who would periodically inspect the work of the contractor, the owner did not owe the contractor's employee a duty of care. *Id*. at 185-86.

In *Coho Resources*, the Mississippi Supreme Court held that there was sufficient evidence to create a jury question as to whether a premises owner retained substantial control over a work site. 829 So.2d at 13. The case involved the death of an independent contractor's employee working to restore production on an old oil well. The court noted that while the independent contractor assumed full and complete responsibility for the conditions pertaining to the work, the contract at issue also vested the owner with the right to dismiss the independent contractor's personnel and to terminate the contract if a complete safety program was not followed. *Id*. at 11. In addition, the contract was a "day rate" or "hourly rate" contract, which stood in contrast to a "turnkey" contract under which a well-service company is paid a set price and is solely responsible for the work. *Id*. at 12. Additionally, the testimony indicated that the owner retained de facto control of the project because: (1) a "company man" of the owner was on site 75%-85% of the time; (2) the owner provided the independent contractor with a step-by-step

procedure that the contractor was required to follow; and (3) the contractor's crew was required to follow the owner's procedure under the supervision of the owner's company man, including the operation that resulted in the accident. *Id*. at 12-13. The company man testified that he had ultimate control over the work, that he was the "boss" of the work site, and that the independent contractor's employees were required to stop and start working when he told them. *Id*. Based on all the evidence of control, the court held that whether the exception to the general rule that an owner does not have a duty to protect an independent contractor applied in that case was a question for the jury. *Id*. at 13.

As noted by the Fifth Circuit in *Linn*, the most important factors to the *Coho Resources* court were those that tended to show that the defendant had de facto control over the aspect of the work giving rise to the plaintiff's death. Those facts included: the plaintiff was required to follow the orders of defendant and its company man on the worksite; the defendant provided plaintiff's employer with a step-by-step procedure to follow in completing the work; the contract specified a daily or hourly pay rate rather than a turnkey price; and the defendant's company man exercised control over and directly supervised the operation taking place when the accident occurred. *Coho Res.*, 829 So. 2d at 12.

The Plaintiffs in this case have provided the following evidence which they contend shows that Noble assumed de facto control over the construction of the pontoon extension. First, Friede Goldman and Noble created a safety program together, in which each person working in the yard, regardless of his employer, had an obligation to address unsafe practices and to stop them immediately. Ct. R. 151 p. 8. Second, Noble had a company man, Neil Mendoza, on site; a superintendent, Lonnie Williams; and a group of site representatives acting as Mendoza's eyes

and ears. Third, the site representatives routinely evaluated Friede Goldman's compliance with plans and specifications, work practices and quality, and "interfaced with Friede Goldman's supervisors to make head counts and to synchronize the work and the movement of materials and equipment." Ct. R. 149 p. 17.

Much of Friede Goldman's evidence has to do with the construction project overall and does not focus on the performance of that aspect of the work that gave rise to McLaurin's injury. The evidence that is relevant to the performance of the work on the pontoons extensions tends to show that Noble did not exercise control over the work. Friede Goldman's President at the time of the accident testified that Noble relied on Friede Goldman to build the pontoon "in accordance with the specifications, our agreements, et cetera." Ct. R. 153-4 p. 2. From the testimony of Friede Goldman's Vice-President of Projects, Kenneth Flint, it is clear that Noble had input into and could monitor the overall project, but Friede Goldman maintained ultimate control. Flint testified that he created the project schedule with input from Noble. Ct. R. 151 p. 5. ("The buck stopped here. As VP of projects, it was my responsibility for the schedule."). Noble did not give Friede Goldman step-by-step instructions for fabrication of the pontoon extensions. Ct. R. 153-5 p. 3. Noble provided the "basic design criteria" for the pontoon extensions to Friede Goldman. Ct. R. 151 p. 3. Friede Goldman then created detail drawings of the pontoon extensions and quoted Noble a price to build them. *Id*. A count of Friede Goldman employees working on the project was not provided to Noble, because "[i]t was a lump sum project and the number of heads we posted to the jobs was - you know, was our business." *Id*. at 17. If Mendoza or one of his supervisors was unhappy with the performance of a Friede Goldman employee working on the project, Noble could recommend that the employee be moved. *Id*. at 9. Then, "if the allegation

upon which [Noble] based their request was found to be true, you know, then we had to replace them on the job." *Id.* Thus, Friede Goldman retained authority to hire and fire its employees working on the project. Flint also testified that it would not have been in the normal course of business for Noble personnel supervising the pontoon extension construction to direct the work of Friede Goldman's employees. *Id*. ("He would not, I don't think, presume to go out there bossing this man's crew."). Flint further testified that Mendoza "didn't hesitate to get out there amongst the troops and - and see what he could glean from - from what he could get from those fellows to talk about there and - and then come to me." *Id.* at 23. "But ultimately, it ended up back on my desk and a decision had to be made in my office or in my project - assistant project manager's office." *Id.*

Mendoza himself acknowledged that he was a "micro manager," Ct. R. 149-6 p. 15. His function at the shipyard was to make sure that all of the pieces of the drilling rig progressed on schedule so that the entire project would be completed on time and with the quality workmanship Noble desired. *Id*. at 10-15. In this regard, he testified: "It is like buying a car from GM. You're interested in the product. You get to survey it upon delivery, make sure it meets what you order." *Id*. at 11.

McLaurin's supervisor testified that Noble never told any members of his crew what to do and that he had "total control over my crew." Ct. R. 153-3 p. 2. McLaurin himself testified that no one from Noble instructed him how to perform his work, and it was one of his Friede Goldman supervisors who told him to work inside the pontoon extension. Ct. R. 153-2 p. 4-7.

Reviewing all of this evidence, the Court finds that it insufficient to create a jury question as to whether Noble had **substantial** de facto control over the work performed on the pontoon

extension.  Although Noble and Friede Goldman cooperated in planning and completing the project, it is clear that Friede Goldman retained ultimate decision-making authority to direct the day-to-day work and activities of its own employees.  It was Friede Goldman that established the procedure to complete the pontoon extension work, and Friede Goldman had responsibility for the manner of completion of the work.  Only Friede Goldman employees were involved in fitting the shelf on the pontoon extension at the time of McLaurin's injury.  The mere fact that Noble could observe, inspect and make recommendations does not establish that it had substantial de facto control over this operation.  *Linn*, 281 Fed. Appx. at 348.  Even assuming that Noble had joint authority over the safety program, that fact would not establish substantial de facto control over the project.  *Coho Res.*, 913 So.2d at 910.  Similarly, Mendoza's presence on site does not establish substantial de facto control because there is an absence of evidence that he was "in fact, if not technically, the ultimate supervisor of the project."  *Linn*, 281 Fed. Appx. at 348.  Unlike *Coho*, where the company man had actual, supervisory control over the work performed by the subcontractor, there is no evidence of that type of relationship in this case.  It is also undisputed that the contract specified a turnkey price on completion.

Finally, although Plaintiffs contend they can establish that Noble site representatives monitoring construction of the pontoon extension failed to exercise their duties with reasonable care on the day of the accident, they do not point to any evidence supporting this contention.  "The nonmovant is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim."  *Fuentes v. Postmaster Gen. of USPS*, No. 07-10426, 2008 WL 64673, at *3 (5th Cir. Jan. 7, 2008) (citing *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994)).  Although the Court endeavored to consider the record as a

whole, "district courts are under no duty 'to sift through the record in search of evidence to support a party's opposition to summary judgment.'" *Id*. (citing *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998); *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n. 7 (5th Cir. 1992)). The testimony noted by the Court above tends to show that Noble was neither expected nor allowed to direct the work of Friede Goldman's employees. Furthermore, there is no evidence that a Noble employee was present to observe the unsafe placement of McLaurin's hand in the pontoon extension.

**IT IS THEREFORE ORDERED AND ADJUDGED** that the Defendants' Motion [146] for Summary Judgment is **GRANTED**. Plaintiffs' remaining claim against the Defendants is **DISMISSED**. All remaining pending motions are denied.

**SO ORDERED AND ADJUDGED** this the 10th day of February, 2009.

s/ *Louis Guirola, Jr.*
LOUIS GUIROLA, JR.
UNITED STATES DISTRICT JUDGE